## S. S. KRESGE CO. v. McCALLION.
### No. 9344.

Circuit Court of Appeals, Eighth Circuit.
April 19, 1932.

Richard S. Righter, of Kansas City, Mo. (George J. Mersereau and Lathrop, Crane, Reynolds, Sawyer & Mersereau, all of Kansas City, Mo., on the brief), for appellant.

W. J. Allen, of Kansas City, Mo. (Roy E. Smith and D. D. Bonewits, both of Kansas City, Mo., on the brief), for appellee.

Before STONE, KENYON, and GARDNER, Circuit Judges.

STONE, Circuit Judge.

This is an appeal from a judgment accorded plaintiff in a personal injury suit.

The petition alleged that plaintiff, while a customer in the store of defendant on December 15, 1923, slipped upon a metal plate

and fell while leaving an escalator on the second floor after coming up on the escalator from the first floor. This metal plate covered the place where a person coming up on the escalator must step from the continuously moving escalator. It was located slightly beyond the second floor opening of the escalator. At the right of this landing place was a handrail for use of persons stepping off of the escalator. The negligence alleged was that the plate was "old, slick, oily, worn, uneven, defective and unsafe," and that plaintiff's way in using the rail was obstructed by persons about the handrail. The issues here are not concerned with the measure or anything in connection with the damages. They relate to the right of recovery.

The claimed errors argued here are of three kinds: (1) Insufficiency of evidence, (2) portions of the charge given, and (3) admission of evidence.

### I. Sufficiency of Evidence.

In the argument of this matter, the main stress is placed upon the degree of care due from appellant. This situation arises from the following: It is appellant's position that, under Missouri decisions, liability cannot be predicated merely upon the "smoothness of the plate" where appellee slipped. These Missouri decisions and the resulting rule seem to have been applied only to situations where there was no legal relation which required more than ordinary care, such as where a person is walking over a floor (Cluett v. Union El. L. & P. Co. [Mo. Sup.] 220 S. W. 865; Koenig v. Heitz [Mo. App.] 282 S. W. 107; Mullen v. Sensenbrenner Mer. Co. [Mo. Sup.] 260 S. W. 982, 33 A. L. R. 176), or up or down steps (Myers v. Strauss [Mo. Sup.] 264 S. W. 801; Lappin v. St. Louis N. L. B. B. Club [Mo. App.] 33 S.W.(2d) 1025; Williams v. Kansas City T. Ry. Co., 288 Mo. 11, 231 S. W. 954). Appellant seeks to confine this case to that rule and thinks it is applicable to the situation presented by the present facts. Since the trial court charged that appellant was a carrier and owed a high degree of care, and that this relation and care covered the place and act of alighting from the escalator, appellant attacks the idea that it was a carrier and also that, if it were a carrier, such relation extended to the place and act of alighting on the plate.

■ In attempting definitions of care in the law of negligence, courts have endeavored to make certain classifications and have announced rules. These attempts are rather futile and meaningless and difficult of practical application and use. Note to St. Louis I. M. & S. Ry. Co. v. Woods, 33 L. R. A. (N. S.) 855. In all situations, the rule is that the legally required degree of care is such care as a reasonably prudent man would exercise in view of all of the surrounding circumstances. The effect of further attempts at classified definitions is simply to declare that certain "surrounding circumstances" require more care than do others. This thought is recognized in a late Missouri case (Capstick v. T. M. Sayman Products Co., 327 Mo. 1, 34 S.W.(2d) 480), where liability was announced where a person fell on a poorly lighted, worn, concrete stairway which was made slippery by being wet, although, in the cases cited above, a wet or slippery step or floor in plain view was held no basis for liability.

■ It is true that the general situation or set of surrounding circumstances affecting the carriage of persons has caused the courts to announce a rule that such carrier owes a "high degree" of care to its passengers, but this is no departure from the general rule of ordinary care under all the surrounding circumstances. However, since such rule as to carriers is universally recognized and applied, we consider this case with that in view. Obviously, if this escalator is to be classed as a carrier, the carrier rule is applicable. Appellant contends that the distinguishing test of a carrier within this rule is the danger of serious injury from the mode of carriage. This danger may well be an important element, or "circumstance," to be always considered when the care of a carrier toward its passenger is in question, but we would be slow to say that it is the acid test. However, if it is to be regarded as the prime test, we see no reason why it should not apply here. An escalator carries people, often many at the same time, from one floor of a building to another. It seems clear that there is the possibility of great injury in its operation. Suppose the steps should suddenly fold up hurling the people upon it down to the lower floor in a heap or should violently stop or start while a person is being carried on the steps. For instances, see Petrie v. Kaufmann & Baer Co., 291 Pa. 211, 139 A. 878, and McBride v. May Dept. Stores Co., 39 Ohio App. 420, 177 N. E. 773. It can well be regarded as a "carrier" within the meaning of this rule as to negligence and care. Petrie v. Kaufmann & Baer Co., 291 Pa. 211, 139 A. 878; McBride v. May Dept. Stores Co., 39 Ohio App. 420, 177 N. E. 773. Whether the escalator is technically a "car-

rier" or not is really not vital, since the nature of this form of transportation is such that the same degree of care should, at least by analogy, be required. In an elevator case, Judge (later Justice) Lurton (Mitchell v. Marker [C. C. A.] 62 F. 139, 142, 25 L. R. A. 33) said: "We see no distinction in principle between the degree of care required from a carrier of passengers horizontally, by means of railway cars or stagecoaches, and one who carries them vertically, by means of a passenger elevator. The degree of care required from carriers by railway or stagecoach is the highest degree." Similarly, we see no distinction in principle in the care required in transporting persons from one floor to another on an escalator slanted at forty-five degrees.

 If it is to be so classified, it is obvious that this relation obtains during the alighting therefrom. Such is the view as to other kinds of carriers. McDermed v. Baker (Mo. App.) 20 S.W.(2d) 597, 598; Rearden v. St. Louis & S. F. R. Co., 215 Mo. 105, 131, 114 S. W. 961; Fillingham v. St. Louis Transit Co., 102 Mo. App. 573, 77 S. W. 314, 317; New York, N. H. & H. R. Co. v. Lincoln, 223 F. 896, 899 (C. C. A. 2); Topp v. United Railways, etc., Co., 99 Md. 630, 59 A. 52, 54, 1 Ann. Cas. 912; Roberts v. Atl. Coast L. R. Co., 155 N. C. 79, 70 S. E. 1080, 1082; Pennsylvania Co. v. McCaffrey, 173 Ill. 169, 50 N. E. 713, 714; 4 R. C. L. 1158. It should even more clearly be the rule as to escalators, because in other kinds of carriage the vehicle is supposed to be stationary at the time of alighting while the escalator does not alter its speed and the passenger must alight while it is moving and usually within a confined time and space and here at an angle.

Clearly, it is not due care to furnish a slippery surface at the only place where the passenger must step from a moving escalator. The evidence here is abundant that this was just what appellant did.

## II. Charge of the Court.

The first attack upon the charge is that it stated appellant was a carrier and owed the care of a carrier to appellee. That we have treated about. In so doing, the court endeavored to declare the degree of care so due.

 Another attack upon the charge is that in one portion the court stated there could be liability if appellant was guilty "of even slight negligence." The court repeatedly defined negligence, as applicable to appellant, as being a failure to "use the highest degree of care which prudent men would observe in like business and under like circumstances to safely carry its customers to said second floor of said store and to enable them to alight thereon in safety." We think this a correct definition, under the carrier rule, and see no departure therefrom in the above expression. Particularly, is this true when taken in connection with the entire sentence of which this is a part. The same expression is used in connection with the definition of contributory negligence.

 A further attack is upon another expression in the charge that "it was the duty of the carrier to provide, as the court has heretofore instructed you, a place for her to alight that would not cause her to suffer injury." The emphasis and objection is aimed at the language, "a place for her to alight that would not cause her to suffer injury." The contention is that this amounted to placing the duty of a positive insurer of safety upon appellant. If this language stood alone in the charge as the only definition or as a separate definition of the duty owing by the appellant, there might be force to the argument, but it is neither. Not only had the court repeatedly defined the duty of appellant to be the exercise of "the highest degree of care which prudent men would observe in like business and under like circumstances to safely carry its customers," but the same definition is in the very sentence which ends with this language under attack, and this language is immediately preceded by the statement, "as the court has heretofore instructed you," which could refer to nothing else than the oft-repeated definition. In fact, the next preceding sentence again admonished the jury that appellee was "required" by preponderance of the testimony to prove "that the defendant was negligent in carrying her as a passenger on its escalator." The entire sentence containing the questioned portion with the one preceding are as follows: "In other words, the plaintiff is only entitled to recover when she has carried the burden of proof which requires her to prove to the jury by a preponderance of the testimony the allegations of her petition; that is to say, that the defendant was negligent in carrying her as a passenger on its escalator, and, gentlemen, I am going to take occasion to comment that there is no evidence here that there was any negligence involved so far as the transit was concerned, that is to say, while the plaintiff was passing from the lower floor to the upper floor. It was at the moment of alighting that she complains, and I should instruct

the jury, gentlemen, that a carrier, a common carrier is not only under the duty to exercise the highest degree of care while it is transporting passengers, actually in the act of carrying them from one point to another point, but that the same degree of care prevails when such passenger is alighting from the instrumentality used in carrying, whether it be an escalator or an elevator or a railway train; so that the relation of passenger and carrier obtained in this case, as the Court is instructing you on the law of the case, until not only while the plaintiff was going up the escalator, but when she was stepping therefrom, and it was the duty of the carrier to provide, as the Court has heretofore instructed you a place for her to alight that would not cause her to suffer injury."

It is not difficult to destroy almost any charge by isolating certain limited expressions therein, but the charge must be considered as a whole with the view of determining the impression conveyed thereby to the jury. We cannot think the jury could have listened to this charge, which again and again spoke of negligence and of care, and therefrom have gotten an impression that negligence was no part of the issue, and that no matter how careful appellant might have been it was liable.

### III. Evidence.

■ Appellant contends that three pieces of evidence were erroneously admitted. The first of these occurred in the testimony of witness Johnson. His testimony was as to the condition of the plate upon which appellee had stepped. He testified to being in appellant's store during the month of December and before the 15th (the date of this accident). The following occurred:

"This step or plate or platform, I observed had been worn slick.

"Q. Tell how you know it was slick? A. I slipped myself, on the same plate and came very near taking a tumble head first back down the escalator. That is how I know.

"Mr. Mersereau: I move that that be stricken out and the jury instructed to disregard it. It doesn't tend to prove or disprove the issues in this case.

"The Court: Motion denied.

"Mr. Mersereau: Save exception."

The argument is that this evidence involved a collateral issue and there was no showing that the plate remained in that condition until the time of the accident. This evidence bore directly upon an important fact in the case and was in no sense a collateral issue. The evidence is clear that this plate remained in its position until it was removed some time after this accident; that any "slickness" thereof was caused by use and that the use continued.

■ The second piece of evidence attacked was during the testimony of the same witness and is as follows:

"Q. What, if anything, did you observe the next morning?

"Mr. Mersereau: Object to that, if your Honor please.

"The Court: What is your object?

"Mr. Allen: The cases hold in this state, in Massachusetts, Colorado and Texas, that evidence of what was done with reference to repairs or alterations may be shown to show a condition.

"The Court: Does that obtain in this jurisdiction?

"Mr. Allen: Yes, sir.

"Mr. Mersereau: It does not; show the federal rule.

"The Court: I am in doubt about it. I will admit it and if I am in error I shall have to amend my ruling later. Objection overruled.

"Mr. Mersereau: Exception. (To which ruling and action of the Court, the defendant, by its counsel, at the time duly excepted and still excepts.)

"By Mr. Allen:

"Q. Now, what did you observe the next day after December 15th? A. I observed that the escalator was dead and a man was at the top of it with a hammer and a chisel roughing that slick place up.

"Mr. Mersereau: I move that that be stricken out and the jury instructed to disregard it.

"The Court: The motion is denied.

"Mr. Mersereau: Exception."

At the close of the testimony, this occurred:

"Mr. Allen: I want to request an instruction to the effect that evidences of changes, if any, made after December 15, 1923, do not show negligence, but is evidence tending to show the condition of the plate on which the changes were made, or something in substance that—

"Mr. Mersereau: (Interrupting) I want to object and except to any charge and comment on the evidence as improper.

"The Court: Do you want me to instruct on any particular subject? You want the burden of proof and the credibility of witnesses covered.

"Mr. Mersereau: The weight of the testimony and the burden of proof, and care required, and negligence, and contributory negligence.

"The Court: You want one on contributory negligence?

"Mr. Mersereau: Yes. Of course I am not limiting myself, your Honor, to—

"The Court: No, I understand. If you get the benefit of any requested instructions, you have to request them.

"Mr. Mersereau: You just asked me what you should cover.

"The Court: I mean if there is some subject that you think I ought to cover, I think you should request it.

"Mr. Mersereau: I have said all I shall until you finish. I do not know what you are going to say. I am making now no special request except such as I have indicated to you as to what the general charge should be."

In the course of the charge, the court said: "Gentlemen, the Court has been requested to instruct you that the evidence offered here as to the roughing up of the plate mentioned in the evidence on the next morning after the alleged accident was for the sole purpose of calling your attention to the conditions there, and not for the purpose of showing any negligence on the part of the defendant; that is to say, that the mere circumstances that the defendant may have roughed up the plate on the next day after the accident, if you believe that that was done, is not a circumstance from which the jury would infer any negligence in the case, but is for the mere purpose and was offered for the purpose of indicating to the jury what the conditions were there, and nothing more."

The argument is that this violates the rule that repairs after an accident are inadmissible. This might be a serious contention were it not that any harm therefrom was removed by appellant in its own evidence later on when it brought out, from the manager of a department near the top of the escalator and other witnesses, the entire situation as to this matter. The manager testified as follows: "The practice of the company at the time of this accident was to have the plate examined every week and sometimes oftener for they had a great deal of business in the store. Every time the plate began to get a little smooth they took chisels and cut it up so that it would be rough at all times. That long steel object there on the floor is either the plate from in front of the escalator or one exactly like it. By roughing the plate, I mean using the cold chisel to make little burrs stand up on it. All the little pock marks I see on the plate there are places where he cut it up with the cold chisel. It was usually done after store hours and for that reason I did not see it done every time."

Also, on cross-examination (without objection) of the same witness: "The stock room was on the fourth and sixth floors, so before I was stationed on the second floor, I had only used the escalator a few times. I cannot say that I ever noticed the plate then, but I know they have roughed it up ever since I went to work on the second floor in 1922. They did not do it every week unless there was a big crowd in the store. When the plate was installed, it had diamond corrugations on it, rough places made by ridges, that covered the whole plate. I do not know of what metal the plate is made nor do I know to what depth the chisel cut in the roughing process. At no time have I used the chisel myself but judging from my observations, I should say that they cut the plate about a sixteenth of an inch as a precaution to prevent people from slipping."

Also, on recross-examination (without objection): "The plate was taken up the next spring following the accident in the middle of December, 1923, so it had been used for several months after the middle of December and the cold chisel had been applied to it during that time."

Also, on direct examination of appellant's witness Riley, engineer in charge of the escalator, occurred the following: "I look it over every morning before the store opens to see that it is ready to run for the day. This plate here, we consider a part of the escalator because it was the landing place. Of course, we looked at that plate and the one at the bottom of the escalator to ascertain their condition. If they were smooth we roughed them up with a cold chisel and hammer. These little nicks or dents I see in the plate are the marks of the cold chisel. It is impossible for me to tell you when the escalator was installed but I was there at least two years before the date of this accident. Every ten days or so we roughened that plate up but we inspected it every morning. A young fellow named Howard Jobes helped me do it.

* * * The company still uses this same practice of roughing up the plate now that it used then. I did the roughening with a cold chisel and hammer."

Also, on cross-examination of the same witness (without objection): "Ever since the first day I worked there they have roughed it up with the cold chisel about every ten days in order to keep it from being smooth. * * * Although I have seen them use the chisel on it, it would be hard to say how deep the chisel would go. Striking a blow with a hammer on the end of the chisel would bury the chisel in the metal a little but I couldn't tell how much because I had no way of measuring how deep it would go. However, I doubt if it would be a thirty-second of an inch. The plate would wear smooth again but the depth of the chisel mark would remain."

Also, on redirect examination of the same witness: "The little burr raised by the chisel gradually wears off but the depth of the chisel mark remains."

Also, on recross-examination (when recalled): "They never roughed up the plate after the store opened. I know because I had charge of it and I do not know of anybody else that would do it."

Also, on direct examination of witness Jobes (helper of Riley):

"Almost once a week I used to see this plate before the escalator. One of my duties was to take a hammer and cold chisel and nick the plate up so it would be rough.

"These little nicks all over the plate like pox marks, some of which one can hardly see, are the cold chisel marks. I put most of them there myself. When I struck the chisel it made a little sharp metal burr stick up on the plate. On the average, I roughed it up almost once a week. The assistant manager and Mr. Riley are the ones who usually told me to rough it up. Mr. Riley inspected the plate very often, I have often seen him do it. It is impossible for me to say when I roughed the plate with reference to December 15, 1923."

Also, on cross-examination of same witness (without objection): "I helped put most of these dents in this plate. The last time I saw the plate was over a year and a half ago when it was at the top of the escalator. The way I can tell that this is the plate that was there then is by the nicks in it. The cold chisel marks identify it for I have never seen any other plate with the same kind of nicks. Therefore, I am positive that this is the very plate that was in the Kresge store in 1923. It is impossible for me to say when it was taken up or where it has been kept or what nicks were put into it after it was taken up for I have not seen it at any time since it was on the floor at Kresge's store. Almost every week I put nicks into it and put a lot of them in after December, 1923, probably most of those that are there now. Although I do not know what the condition of the plate was on December 15, 1923, and can't remember having seen the plate on that day, I do know that it was nicked up, for I remember seeing the plate three or four days before the accident. I have never seen the plate get very slick for Mr. Riley kept it pretty well roughed up."

Also, on direct examination of witness Fisher, store manager for appellant: "The maintenance man for Kresge is directed to keep any places such as that on the stairway, rough at all times. He made those marks on the plate with a cold chisel and hammer in compliance with my orders. I saw this place, both just before and after the accident to Mrs. McCallion, having had a look at it about an hour after the accident. However, I do not remember the condition at the time and do not know whether it had just been roughed up or not, but when I saw it, it looked as it does now. Mr. Tate was the department manager on the second floor at that time—the same gentleman who testified here. He made out a report to my secretary. Mr. Riley was the maintenance man at that time and he had charge of the escalator and of the roughening up of the plate. Jobes helped him but Mr. Riley was the one responsible for roughening the plate. I understand that Mr. Riley is now in Texas but I do not know. However, he is no longer in the employ of the Kresge Company. That plate was taken up either in March or April, 1924. I have seen the plate roughed up. Take a sharp cold chisel and a hammer and strike the corner of the cold chisel against the steel plate to make a dent or little burr."

Also, on cross-examination of same witness (without objection): "I do not remember how often the plate was roughed but the instructions were to keep it rough at all times. It was roughed about every week or ten days. This particular plate here was in there from 1915 to 1923 continuously. We started to rough it about 1918, I think. For at least five years, we had been roughing it weekly when it wears down."

Also, appellant introduced the plate itself (taken up afterwards) and it showed the dents.

Clearly, this evidence could not have been prejudicial. We are not to be understood as in any degree sanctioning a practice of introducing evidence of repairs made after an accident. What we say is that here this error was rendered entirely harmless by the action of appellant in introducing the above-quoted testimony.

The final contention as to admission of evidence occurred in the testimony of Mrs. Karman and was as follows:

"About a couple of weeks before I went to the hospital, I was in the Kresge Ten Cent Store. That was about the middle of December, 1923. I had occasion to go to the second floor using the escalator and noticed that the plate on the top landing was worn.

" 'Q. Tell the jury what the condition was, or what you observed there as to the apparent condition of that plate, as to its appearance.'

"Mr. Mersereau: Now, I renew my objection.

"The Court: What is the date of that?

"Mr. Mersereau: About two weeks before. 'About a couple of weeks before I went to the hospital I went down to Kresge's Ten Cent Store.' Now, he has asked to tell the jury what the condition was at that time and I object to that and renew the objection. It is incompetent, irrelevant and immaterial to the issues in this case, raises a collateral issue and is not connected.

"The Court: You are seeking to prove the condition of the plate two weeks before that?

"Mr. Allen: Yes, sir.

"The Court: Objection overruled.

"Mr. Mersereau: Note an exception. (To which ruling and action of the Court, the defendant, by its counsel, at the time duly excepted and still excepts.)

" 'Q. You may answer. A. What is it?

" 'Q. The appearance of the plate? A. It was terribly worn and slick and dished.'

"Mr. Mersereau: Now, I move that that be stricken out, the characteristics of it. She can tell what it looked like.

"The Court: The motion is denied.

"Mr. Mersereau: Exception."

The contention is that the court erred in not striking out the word "terribly" in the last answer. This contention does not merit serious examination.

The judgment should be, and is, affirmed.